IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

CLAUDE E. BODDIE AND
AJAX MORRIS, JR.                                                                    PLAINTIFFS

VS.                                                             CIVIL ACTION NO. 4:07CV63-M-B

CLEVELAND SCHOOL DISTRICT                                                DEFENDANTS

ORDER

This cause comes before the court on the motion of defendant Cleveland School District ("CSD") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiffs Claude E. Boddie and Alex Morris, Jr. have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is not well taken and should be denied.

This is a Voting Rights Act ("VRA") case in which plaintiffs, registered voters in Cleveland, Mississippi, claim that their voting rights were diluted by defendant CSD's inclusion of certain Delta State University dormitory residents in the apportionment base for its districting plan. According to the 2000 census, the CSD has a total population of 21,588 and a voting age population of 15,949. The CSD included 1052 Delta State students living in dormitories in the apportionment base for its districting plan, and plaintiffs take issue with the manner in which these students were included. The CSD Board of Trustees consists of five trustees elected from districts, of which three are majority African-American and two are majority white districts. Plaintiffs' expert notes that "currently there are two African-American trustees and three white trustees," and this fact appears to have largely motivated this lawsuit.

Section 2 of the VRA forbids state and local voting procedures that "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote on account of race[.]" 42 U.S.C. § 1973(a). A § 2 violation is shown if, "based on the totality of circumstances," members of a racial group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). To establish a § 2 violation on a vote-dilution theory, courts apply the two-part framework in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), which requires that plaintiffs satisfy, as a threshold matter, three preconditions. Specifically, the minority group must demonstrate that:

> (1) it is sufficiently large and geographically compact to constitute a majority in a[n additional] single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances-usually to defeat the minority's preferred candidates. Failure to establish all three of these elements defeats a [§ 2] claim. Second, if the preconditions are proved, plaintiffs must then prove that based on the totality of the circumstances, they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 667 (5th Cir. 2009)(citation omitted).

If the plaintiffs satisfy the three *Gingles* preconditions, the district court must then determine whether, under the totality of the circumstances, the plaintiffs have proven the existence of vote dilution under the challenged plan. *Houston v. Lafayette County, Miss.*, 56 F.3d 606, 609-10 (5th Cir.1995). The factors to consider in making this determination include the following:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

>   (3) the extent to which the state or political subdivision has used unusually *905 large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>   (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>   (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>   (6) whether political campaigns have been characterized by overt or subtle racial appeals; and
>   (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles,* 478 U.S. at 36-37, 106 S.Ct. 2752. See also *Fairley*, 584 F.3d at 667-68.

The Fifth Circuit's decision in *Fairley* constitutes a significant obstacle to plaintiffs' claims in this case, inasmuch as the Court affirmed Judge Starrett's ruling rejecting very similar claims which were brought in the Southern District of Mississippi. The plaintiffs in *Fairley* were represented by the same counsel as plaintiffs' counsel here, made allegations in their complaint which closely tracked those here and similarly relied heavily upon the expert testimony of demographer William S. Cooper. Where differences do exist between *Fairley* and this case, they often do not assist plaintiffs' claims in this case. Indeed, the plaintiffs in *Fairley* alleged in their complaint that the City of Hattiesburg's inclusion of USM students in its apportionment base resulted in a "46.68 percent total deviation," while the plaintiffs in this case allege that the City of Cleveland's plan "has a 34.34 percent total deviation." Thus, the complaint in this case would appear to allege a less serious VRA violation than the ones which the Fifth Circuit rejected in *Fairley*.

The degree of total deviation is a crucial factor in this case, since the Supreme Court has stated that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth

3

Amendment so as to require justification by the State." *Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690 (U.S. 1983)(citation omitted). The Supreme Court in *Brown* further stated that "[o]ur decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." *Brown*, 462 U.S. at 842, *citing Connor v. Finch*, 431 U.S. 407, 418, 97 S.Ct. 1828, 1835 (1977) and *White v. Regester*, 412 U.S. 755, 764, 93 S.Ct. 2332, 2338 (1973). The ten percent threshold is crucial because, in this case, plaintiffs' own expert Cooper submitted a supplemental report in which he found that a less than ten percent deviation would exist if Delta State dorm residents were excluded.

Plaintiffs initially introduced a proposed apportionment plan which excluded Delta State dormitory residents outright. The Fifth Circuit made it very clear in *Fairley* that it disapproved of a plan which simply ignored the existence of dorm residents who were also city residents, writing that:

> The plaintiffs' theory, in their illustrative plan, seems to have been that removing the dormitory students, whether legal residents or not, from districting calculations would reduce the ideal number of officially-counted residents per district. Because the excluded students are mostly white, that would have made it easier to create a third majority black ward. In other words, the plaintiffs wished the district court to order the City to redistrict based on fictional population data, namely the pretense that a number of City residents were not there. Although resident students would still have been actually present, and therefore able to vote, the plaintiffs evidently assumed that lower voter turnout among the students would have protected the electoral power of the inflated black majorities. Nothing in Cooper's testimony or report suggests how to avoid excluding resident students.

The Fifth Circuit in *Fairley* further explained that:

> Though "aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime" may be excluded for voter apportionment purposes, *Burns v. Richardson*, 384 U.S. 73, 92, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *see also Boddie v. City of Cleveland*, 297 F.Supp.2d 901, 905-06 (N.D.Miss.2004), bona fide City residents certainly may not be. No authority

4

supports or permits the solution the plaintiffs proposed. Because they did not explain how the unconstitutional exclusion of residents in the course of implementing their desired redistricting plan could be avoided, the district court was correct in rejecting it.

It is at this point that the distinction between resident and non-resident students must be emphasized. The concept of a non-resident dorm student may appear to be something of a contradiction, but the term appears to refer to students who do not vote in local elections or consider themselves residents of the local voting district. It appears that the Fifth Circuit in *Fairley* was concerned with the possibility that dormitory residents who were also <u>city residents</u> would be excluded and that it was not troubled by the prospect that dorm students who were not city residents would be excluded.

That brings this court to what is clearly the strongest factor supporting plaintiffs' position that this case should proceed to trial. In prior litigation involving these very same plaintiffs, Judge Davidson found that the City of Cleveland's aldermanic wards were in violation of the one-person/one-vote principle of the Voting Rights Act and the Fourteenth Amendment. In *Boddie v. City of Cleveland* (*Boddie I*), Judge Davidson specifically ordered that non-resident Delta State dormitory students be excluded for City of Cleveland aldermanic districting purposes, writing that:

> The Plaintiffs assert that the inclusion of the non-resident student population residing at Delta State University (DSU) into the apportionment base is impermissible. States and other political subdivisions are not required to include transients, short-term residents or temporary residents in the apportionment base upon which their voting districts or wards are based. *Burns v. Richardson*, 384 U.S. 73, 91-92, 86 S.Ct. 1286, 1296-97, 16 L.Ed.2d 376 (1966). In *Fairley v. Patterson*, 493 F.2d 598, 602 (5th Cir. 1974), the Fifth Circuit upheld a Forrest County, Mississippi, supervisory redistricting plan which omitted from the reapportionment calculations all non-resident students at the county's two colleges who were unmarried and resided in dormitories or fraternity houses on campus; this totaled some 3,077 students. Non-resident students residing off campus were included in the Forrest County apportionment base; only those residing in dormitories were excluded. *Fairley*, 493 F.2d at 602-603. In arguing against

5

> exclusion of the subject DSU students, the Defendants assert that excluding the students would violate their rights under the equal protection clause and the principle of one person/one vote. This is the same argument raised in *Fairley* on behalf of the Forrest County students who were excluded from the apportionment base. As the Fifth Circuit held in that case, the court here finds that such claims can only be asserted by the students themselves; no other person or entity has standing to assert those rights on behalf of the students. *Fairley*, 493 F.2d at 604; *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589, 92 S.Ct. 1716, 1720, 32 L.Ed.2d 317 (1972); *Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943). The Defendants' arguments against exclusion, therefore, are without merit.

*Boddie I*, 297 F.Supp. 2d 901, 905-06 (N.D. Miss. 2004).

The Fifth Circuit's decision in *Fairley* arguably casts some doubt upon *Boddie I*, but it also possible that *Boddie I* will serve as a basis for distinguishing this case from *Fairley*. Judge Davidson specifically ordered the exclusion of non-resident Delta State students for the purpose of apportioning aldermanic wards, and this court is interested in hearing testimony regarding how this ruling has been implemented and whether it might serve as a basis for a similar resolution of this case. There is some indication in the record that other local governmental entities in Bolivar County have used Judge Davidson's ruling as a model for their own apportionment plans. In his initial report, Cooper wrote as follows:

> In 2006, the Bolivar County Board of Supervisors adopted an election plan that is consistent with Judge Davidson's 2004 ruling. For the five-district plan, 1,002 non-resident students living in Delta State dorms in census blocks 3007 and 3015 were removed from the county's base population for apportionment purposes. (An additional fifty students living in the dorms who were not residents of the City of Cleveland were determined to be residents of Bolivar County) .

The Fifth Circuit found in *Fairley* that the plaintiffs had failed to demonstrate a workable plan for excluding only non-resident USM students, but it is at least possible that the existence (and enforcement) of Judge Davidson's prior ruling will allow the plaintiffs to succeed in this case where the plaintiffs in *Fairley* failed. Specifically, the plaintiffs should present proof of how this

6

court might ascertain which Delta State dormitory residents are also city residents and which are not, so that the court can ensure that the former are not disenfranchised.

In concluding that this case should proceed to trial, the court also notes that Judge Starrett only issued his ruling in *Fairley* after a trial on the merits, and the Fifth Circuit emphasized in *Fairley* that "the need for a developed district court record is especially acute in VRA cases." This court is troubled by the highly vague nature of the arguments set forth in plaintiffs' brief, and it will be incumbent upon them at trial to set forth <u>specific arguments and proof</u> as to why they are entitled to recover under *Gingles* and *Fairley*. This court strongly considered granting summary judgment based on the lack of specific arguments in plaintiffs' brief, but it ultimately concluded that the plaintiffs' success in prior litigation and the importance of the interests at stake require a closer look at their claims.[1]

In light of the foregoing, defendant's motion for summary judgment is **denied**.

SO ORDERED, this the 14th of January, 2010.

        <u>/s/ MICHAEL P. MILLS</u>
        **CHIEF JUDGE**
        **UNITED STATES DISTRICT COURT**
        **NORTHERN DISTRICT OF MISSISSIPPI**

---

[1] It is possible that the trial will prove to be closer in nature to a short hearing, if plaintiffs do not present more specific arguments and proof than they have done to date. This court has shown considerable lenience to plaintiffs in denying defendant's summary judgment motion, but they should not expect similar lenience at trial, where the evidentiary burden facing them will be considerably higher than it is at the summary judgment stage.